```
         IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
```

**UNITED STATES OF AMERICA**          :

   **v.**                                 :     CRIMINAL NO. 09-346-01

**PETER EDWARD ALESZCZYK,**           :
 a/k/a "Peter Alex"

## GOVERNMENT'S CHANGE OF PLEA MEMORANDUM

**I.   INTRODUCTION**

Defendant PETER EDWARD ALESZCZYK, a/k/a "Peter Alex" intends to waive indictment by grand jury and enter a guilty plea to a two count information charging wire fraud, in violation of 18 U.S.C. § 1343 (Count One); and mail fraud, in violation of 18 U.S.C. §1341(a)(1)(Count Two).

**II.  ELEMENTS OF THE OFFENSE**

   **A.   Wire Fraud - 18 U.S.C. § 1343**

To establish a violation of 18 U.S.C. § 1343 (wire fraud), the government must prove the following elements beyond a reasonable doubt:

      1.   The defendant devised or intended to devise a scheme or artifice to defraud, or to obtain money or property by means of false or

1

>     fraudulent pretenses, representations or
>     promises, and
> 2. For the purpose of executing the scheme or
>     artifice or attempting to do so,
>     knowingly caused to be delivered by wire in
>     interstate commerce any writings, signals or
>     sounds.

B.  <u>Mail Fraud - 18 U.S.C. § 1341</u>

To establish a violation of 18 U.S.C. § 1341 (mail fraud), the government must prove the following elements beyond a reasonable doubt:

> 1. The defendant devised or intended to devise a
>     scheme or artifice to defraud, or to obtain
>     money or property by means of false or
>     fraudulent pretenses, representations or
>     promises, and
> 2. For the purpose of executing the scheme or
>     artifice or attempting to do so,
>     knowingly caused to be delivered by mail, or
>     by any private or commercial interstate

>       carrier, any matter or thing according to the
>       directions thereon.

III.   **Plea Agreement**

A copy of the plea agreement is attached.

IV.   **Maximum Penalties**

The Court may impose the following statutory maximum sentences: Count One (wire fraud), 20 years imprisonment, a $250,000 fine, 3 years of supervised release, and a $100 assessment; and Count Two (mail fraud), 20 years imprisonment, a $250,000 fine, 3 years of supervised release, and a $100 special assessment.

**Total Maximum Sentence** is:   40 years imprisonment, a $500,000 fine, 3 years of supervised release and a $200 special assessment.  Full restitution of $560,629.76 shall be ordered.

Supervised release may be revoked if its terms and conditions are violated.  When supervised release is revoked, the original term of imprisonment may be increased by up to 3 years per count of conviction.  Thus, a violation of supervised release increases the possible period of incarceration and makes it possible that the defendant will

have to serve the original sentence of imprisonment, plus a substantial additional period of imprisonment, without credit for time already spent on supervised release.

V.  **Factual Basis for the Plea**

1.  KP Consulting, a/k/a KP Pharmaceutical Consulting, Inc., a/k/a KP Pharmaceutical Services, Inc. ["KP"], 102 Pickering Way, Suite 200, Exton, Pennsylvania, is a company owned solely by defendant Peter Edward Aleszczyk, a/k/a "Peter Alex".  KP offers consulting and recruiting services for the pharmaceutical and biotech industry.  E & W Services LLC, a/k/a E & W Services ["E&W"], 102 Pickering Way, Suite 200, Exton, Pennsylvania, was an additional consulting company created by Aleszczyk.  Company No. 1 was a pharmaceutical company with its main office and a research and development facility located in Gaithersburg, Maryland. Company No. 2, Mount Laurel, New Jersey, is the victim company in this case and places individuals in temporary, permanent, and contract assignments.  Company No. 2 entered into a business relationship with KP that resulted in approximately 30 financial transactions (mailing of checks and interstate wire transfers of funds totaling $560,629.76)

from on or about September 30, 2008 to on or about December 18, 2008, initiated by company No. 2 based on fraudulent representations made by Aleszczyk.

    2.  On January 21, 2009, the President of Company No. 2 became a cooperating victim witness (CW) after he came into the Newtown Square office of the FBI to file a complaint of an alleged fraud scheme committed by Aleszczyk against his company.  The CW was initially introduced to Aleszczyk in the summer of 2008.  The CW would testify that his company had provided $560,629.76, from on or about September 30, 2008 to on or about December 18, 2008, to Aleszczyk to finance payroll for temporary employees to be placed by Aleszczyk at Company No. 1.  After Company No. 2 paid the alleged temporary employees through Aleszczyk, Company No. 2 was then supposed to bill Company No. 1 for reimbursement at a higher rate than the payroll and share the profit with Aleszczyk.  Company No. 1 ultimately stopped payments at the direction of Aleszczyk on these alleged temporary employees and alerted the FBI when the CW was unable to verify the alleged employees' existence at Company No. 1.  The FBI would ultimately determine that all of the nine individuals

alleged by Aleszczyk to be temporarily employed at Company No. 1 were never employed at Company No. 1 pursuant to a placement by KP or Aleszczyk.

    3. On January 21, 2009, a conversation between CW and Aleszczyk was recorded and witnessed by the FBI. A portion of the call is as follows:

CW = cooperating witness; PA = Peter Aleszczyk

```
CW:  ...these people are still working at [Company No. 1]
     right?
PA:  Oh, yea, yea, yea, yea
CW:  Ok
PA:  Your not gonna....there's no shocks (laugh) you are ok
     and everything will work out in the end
CW:  And they've all been there since September I mean I was
     looking at some of the reports
PA:  yea
CW:  and you have got em at like New Hampshire, Pennsylvania
PA:  Yea, everybody is ok and everyone will be happy, there
     won't be any surprises and in the end you are going to
     say all right, you know what a lot of headache but we
     made money
CW:  Right, and your, and your...
PA:  Which is the end result
CW:  Right, and you have been paying the people the whole, I
     mean through all the monies that we've been..
PA:  Yes, yea I mean I have had to cover them now, I've had
     to cover them
```

    4. Aleszczyk told Company No. 2 that he was in contact with Company No. 1. Defendant ALESZCZYK falsely created email messages between himself and Company No. 1 which he then forwarded by computer to Company No. 2 between January

6

6 to February 6, 2009 to show that temporary employees had been placed by KP with Company No.1, when, in fact, such temporary employees had not been placed with and did not work at Company No. 1.  Defendant ALESZCZYK also purchased an internet domain name similar to the name of Company No.1 and established email addresses using this domain to make it falsely appear that the temporary employees that defendant had claimed to have been placed with Company No. 1 actually worked at Company No. 1, when, in fact, the temporary employees did not work at Company No. 1.

    5. The controller for Company No. 1 would testify that the wire transactions set forth in the criminal information were initiated at a computer located in Mount Laurel, New Jersey and all the wire transactions were initiated from an account Company No. 2 held with TD Bank (formerly Commerce Bank) in New Jersey.  A representative of TD Bank would testify that these wire transfers traveled through the Federal Reserve Bank in Philadelphia, PA before they reached their ultimate destinations because all domestic wires processed through the Fedwire system at TD Bank (formerly Commerce Bank) are routed through the closest Federal

Reserve Bank, in this case, the Federal Reserve Bank in Philadelphia.

    6.   The CW, President of Company No. 2, would testify that the check payments listed in the criminal information were sent in the United States Mail via the United States Postal Service pursuant to office procedure.  These checks were made payable to KP Consulting Incorporated and E&W Services LLC and were sent via the United States Postal Service, from Mount Laurel, New Jersey, to 102 Pickering Way, Suite 200, Exton, Pennsylvania.

    7.   A total of $560,629.76 as charged in the criminal information was transferred from Company No.2, by wire and mail communication (a total of 30 separate transactions) from New Jersey, to and/or through the Eastern District of Pennsylvania, for the benefit of Aleszczyk and various individuals whom Aleszczyk owed money.  From on or about September 30, 2008 to on or about December 18, 2008, Company No. 2 intended for the above stated money to be used to pay individuals it believed were temporarily employed at Company No. 1, not to enrich  Aleszczyk personally.   The $560,629.76 has been broken down into 12 mail transactions

as well as 18 wire transactions, from on or about September 30, 2008 to on or about December 18, 2008 as listed in the criminal information.  All 30 transactions benefitted Aleszczyk either directly, where funds were used for personal use, or indirectly, where funds were used to pay outstanding personal debts owed by Aleszczyk to various individuals.

    8.  On February 11, 2009, Aleszczyk was interviewed by the FBI.  Aleszczyk provided a background on his companies (KP and EW) and indicated that he was in financial trouble.  Aleszczyk stated that midway through 2008 cash flow problems got out of control.  Aleszczyk stated that he is the sole owner of his companies.  Aleszczyk went in to detail as to how his consulting company operates.  Aleszczyk stated that he primarily deals with the validation side of the pharmaceutical industry.  Aleszczyk places validation engineers in pharmaceutical companies to aid in the validation process of various drugs as they get manufactured.  Aleszczyk stated that he places two types of consultants into the companies he works with, temporary and permanent.  If Aleszczyk places a permanent employee, that

9

employee is paid by the company he or she is placed with, not by KP.  KP makes a profit off the placement based on an agreed upon percentage of the salary the employee was set to receive.  If Aleszczyk places a temporary employee, KP is required to pay the consultants salary and then request reimbursement through the accounts payable department of the company where the employee was placed.

Aleszczyk stated that his problems began when he was unable to fund the contract side (temporary placement) of his business.  Aleszczyk then admitted to having numerous personal loans with various individuals.  When asked what the money received through these loans was used for, Aleszczyk stated that some money was used for personal debts, some was used for business expenses, but in general the money was used to pay "whatever the most delinquent bill was at the time."

Aleszczyk then talked about his relationship with Company No. 2 and the CW.  Aleszczyk said that the individuals Company No. 2 thought they were paying in fact did not work at Company No. 1 and that he attempted to make them look legitimate in order to obtain funds from Company

No. 2.  Aleszczyk said that he also purchased an internet domain similar in name to Company No.1 and established fake email addresses using this domain to make it appear that the temporary employees alleged by him to work at Company No. 1 worked at Company No. 1.  Aleszczyk stated that nine individuals were portrayed to be temporary employees at Company No. 1 but did not actually work there when Aleszczyk obtained funds from Company No. 2 for their work.

          LAURIE MAGID
          United States Attorney


          _____
          EWALD ZITTLAU
          Assistant United States Attorney

## CERTIFICATE OF SERVICE

**_____I hereby certify that a copy of the foregoing has been delivered to:**

>John J. Griffin, Esq.
>239 S. Camac Street
>Philadelphia, PA 19107

**_____**
**EWALD ZITTLAU**
**Assistant United States Attorney**


**DATE:**